Theodore A. Siniarski, Trustee, Appellee, v. Will A. Hudson, Sr., Trading as Will A. Hudson Boiler and Welding Company, Appellant.

Gen. No. 44,659.

138

Opinion filed June 29, 1949. Released for publication July 18, 1949.

HUBBARD, BAKER & RICE, of Chicago, for appellant; REESE HUBBARD and WILLIAM C. WINES, both of Chicago, of counsel.

JULIUS S. NEALE, of Chicago, for appellee; WALTER E. MOSS, of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Theodore A. Siniarski filed a complaint in the superior court of Cook county against Will A. Hudson, Sr., and Will A. Hudson, Jr., doing business as Will A. Hudson Boiler & Welding Co., alleging that he, as trustee, under the provisions of a trust agreement dated February 21, 1941, and known as Trust No. 4143, acquired title to the premises commonly known as 4143-45 Archer avenue and 4102-12 South Francisco avenue, Chicago, by deed in trust from Martin Gorski, a bachelor, dated March 7, 1941, and recorded in the Recorder's Office of Cook county on April 28, 1941, as document 12668821 in Book of Records 36535 at page 245; that since then he has been and ''now is the owner and in possession'' of the premises, which consist of

a two story brick and terra cotta building containing a basement, three stores, three offices, two garages, one six room apartment and three four room apartments, all occupied by tenants of plaintiff, which premises at all relevant times were in good condition; that prior to or on or about April 15, 1946, plaintiff, as trustee, entered into a verbal contract with the defendants, whereby, for a valuable consideration, the latter promised to install in the basement of the premises a certain oil storage tank which was to be connected with a certain other oil storage tank then upon the premises; they agreed to make the installation in a neat and workmanlike manner without harm to plaintiff's premises; that at all times plaintiff was in the exercise of due care and caution for the safety of the premises; that it became the duty of the defendants to use due care and caution in the performance of the contract; that on or about April 15, 1946, in the performance of the contract, the defendants, by and through their agents or servants, entered upon the basement of the premises; that defendants, through their agents or servants, were then and there working in and upon the premises and were in the sole and exclusive possession, care and control of the basement thereof; that in breach of their duty to use due care and by their negligent use of materials and apparatus necessary for the task in hand, and under their control, and by their negligent management, operation and care thereof, an explosion took place within the basement, from which a conflagration ensued; that as a direct and proximate result of the explosion the property of plaintiff, as trustee, was damaged and partly destroyed, whereby plaintiff lost rents and profits he otherwise would have made; and that the premises were greatly depreciated in value and otherwise damaged. Plaintiff, as trustee, prayed for judgment in the sum of $35,000.

In an amended answer defendants "deny that plaintiff is the owner of the premises in question"; deny

that "these defendants, or either of them, entered into any contract or agreement with the plaintiff as alleged in paragraph 2"; deny that plaintiff was in the exercise of due care; deny that there was any contract between plaintiff and defendants as alleged; deny that the defendants or any other person on their behalf were in the sole or exclusive possession, care or control of the premises; deny any negligence; assert that if there was an explosion or conflagration it was not caused by any negligence of defendants; deny that as the proximate result of the explosion plaintiff sustained any damage, or that he sustained any damages. Will A. Hudson, Sr., one of the defendants, filed a counterclaim against Theodore A. Siniarski, as trustee, and against Dr. V. E. Siedlinski. Thereafter, he dismissed his counterclaim against Theodore Siniarski, as trustee. A trial resulted in a verdict for the plaintiff with damages assessed at $4,000 and a separate verdict against the counter-defendant in favor of Will A. Hudson, Sr. for $945. Motions by defendants as to the case in chief for a directed verdict, for judgment notwithstanding the verdict and in the alternative for a new trial were overruled and judgment was entered for plaintiff and against defendants for $4,000 and for counter-plaintiff, Will A. Hudson, Sr., and against counter-defendant, Dr. V. E. Siedlinski, for $945. Defendants appeal from the judgment against them. Dr. Siedlinski has not appealed. Will A. Hudson, Sr. stated that he owns the business operated under the name of Will A. Hudson Boiler & Welding Co., and that his son has no interest therein. No point is made that the judgment is erroneous in that it is against both the father and son. Defendants concede that the proof sustains the verdict so far as the damages are concerned, if there is liability.

The first point advanced by defendants is that there was no evidence of title or proprietary interest in the plaintiff; that the evidence showed legal

and equitable title in third persons; that the convey-
ance to the plaintiff "as trustee" created a dry, naked
or passive trust; and that consequently, the trustee
took no more title than he would if he had not been
named in the deed. Plaintiff meets this argument by
stating that on the complaint, answer and the evidence
both the legal and equitable title are in plaintiff. This
is a law action based on negligence. In a court of law,
a trustee having the legal title to real estate, together
with the right of possession, is regarded as the owner
of the property, having all the rights and subject to
all the liabilities. *Wahl v. Schmidt,* 307 Ill. 331, 336.
Defendants, citing *Witham v. Brooner,* 63 Ill. 344;
*Harrison v. Kamp,* 395 Ill. 11, and other cases, state
that the deed to plaintiff was a "mere conduit to the
beneficiaries" and that all title, legal as well as equi-
table, passed to the beneficiaries. Defendants' answer
did not deny that plaintiff, as trustee, under a trust
agreement dated February 21, 1941 and known as
Trust No. 4143, acquired title to the premises, that
plaintiff was in possession, and that the premises were
occupied by tenants of plaintiff. The deed was not
made a part of the complaint. The number of the trust
agreement and the information as to the recordation
of the deed was given. Defendants did not seek to
have the complaint made more specific. They merely
deny that plaintiff is the owner of the premises in
question. Section 40 of the Practice Act [Ill. Rev.
Stat. 1947, ch. 110, par. 164; Jones Ill. Stats. Ann.
104.040] provides that general issues shall not be em-
ployed, that every answer and subsequent pleading
shall contain an explicit admission or denial of each
allegation of the pleading to which it relates, and that
every allegation, except allegations of damages, not
explicitly denied shall be deemed to be admitted, un-
less the party shall state in his pleading that he has
no knowledge thereof sufficient to form a belief and
shall attach an affidavit of the truth of such statement

of want of knowledge, or unless he has no opportunity to deny, and that denials must not be evasive, but must fairly answer the substance of the allegation denied. When the allegations of the complaint are considered with the general denial of defendants as to ownership, it becomes apparent that the answer in this respect is evasive and that it does not fairly answer the substance of the allegation. For that reason we conclude that plaintiff acquired title in the manner alleged in the complaint. The point raised a question of law which defendants could have urged by a motion under sec. 45 or sec. 48 of the Civil Practice Act [Ill. Rev. Stat. 1947, ch. 110, pars. 169, 172; Jones Ill. Stats. Ann. 104.045, 104.048].

Defendants urge further that even if the original deed conveyed title to the plaintiff, the certified copy offered was wholly incompetent because the statutory foundation was not laid for its admission. They state that under sec. 36 of the Conveyances Act (par. 35, ch. 30, Ill. Rev. Stat. 1947 [Jones Ill. Stats. Ann. 29.37]) and the applicable decisions, that before a certified or other copy of a recorded muniment of title may be received in lieu of the original, there must be either oral testimony or statutory affidavit that the original is lost or not in the power of the party wishing to use it on the trial of any such cause, and that to the best of his knowledge the original deed was not intentionally destroyed, or in any manner disposed of for the purpose of introducing a copy in place of the original. In view of the admission in defendants' answer, it was unnecessary to offer a copy of the deed and therefore unnecessary to produce oral testimony or an affidavit in accordance with sec. 36 of the Conveyances Act. Defendants, however, state that even in the absence of any traverse or an answer, where parties, without objection, actually litigate an issue, one side offering and the other objecting or otherwise disputing the sufficiency of the proof, the plaintiff can-

not be heard to say that there was no issue joined and that he was not bound to prove his case, citing *Lindsey v. Goldblatt Bros., Inc.,* 316 Ill. App. 443 (abst.) and *Strohm v. Hayes,* 70 Ill. 41. We do not believe that there was an issue as to plaintiff's right to sue either on the pleadings or in the trial. There was testimony that Dr. Siedlinski was a beneficiary and that there were other beneficiaries. Dr. Siedlinski was managing the property for plaintiff. In fact, defendants maintain that Mr. Hudson, Sr. had a contract with Dr. Siedlinski, which was the basis for the counterclaim and judgment by Mr. Hudson, Sr. against Dr. Siedlinski.

■ The following is one of the instructions sought by defendants and refused by the court:

"The jury is instructed that before the plaintiff can recover in this case, the plaintiff must prove by a preponderance of the evidence: 1. That the plaintiff was in the exercise of reasonable and ordinary care. 2. That there were no dangerous explosives in and about the premises. 3. That no person other than the three employees of the defendant had access to the basement immediately before and at the time of the explosion in question. 4. That no substance was in the tank which exploded other than No. 5 fuel oil. 5. That the No. 5 fuel oil exploded as the result of the negligence of one or more of the three employees of the defendants. The jury is further instructed that if you find from the evidence that the plaintiff has failed to prove any one of the above and foregoing, then you must find the defendants not guilty."

This is a peremptory instruction and would authorize the jury to return a verdict for the defendants if any of the elements therein mentioned was not proved. Presumably, defendants included in the instruction every point in issue to be decided by the jury. By leaving out of this instruction a requirement that

plaintiff prove that he was the owner, defendants showed that they were not relying on any such issue. The court gave to the jury the following instruction:

"If you believe from a preponderance of the evidence and under the instructions of the court that on the 15th day of April, 1946, the defendants, through their agents and servants, were connecting a certain fuel oil storage tank of about 800 gallon capacity with a certain other fuel oil storage tank of about 1700 gallon capacity in the furnace room of the premises . . . ; and if you further believe that the plaintiff, Theodore A. Siniarski, as trustee, was at the time of and just prior to the occurrence herein mentioned in the exercise of due care and caution for the safety and preservation of his said premises and his said premises were in good condition and that as a direct and proximate result of said carelessness and negligence of the defendants, the premises of the plaintiff were greatly damaged and destroyed, then you should find the defendants guilty."

The latter instruction does not contemplate that there was any issue as to ownership. It assumes that plaintiff was the owner. Defendants do not complain about the giving or refusal to give any instructions. If there was any issue of fact as to the right of plaintiff to sue, that point should have been presented to the jury in the form of instructions. As the record stands, the jury was not asked and did not pass upon that question. The proposition urged by defendants was purely a proposition of law which if properly presented, should have been resolved before the trial commenced.

As their second point, defendants argue that the evidence does not support the verdict on the issue of their liability for the explosion. Plaintiff states that on this issue the verdict is in accordance with the law and the evidence. The premises on the southwest

corner of Francisco and Archer avenues in Chicago are improved with a brick building, occupying the entire 125 foot length from Archer avenue south to the alley, and extending to a width of 50 feet in a southwesterly direction on Archer avenue. There are stores on the first floor and offices and apartments on the second floor. Plaintiff and Dr. Siedlinski participated in the management of the building. The building was heated by an oil burner located in the basement. In the basement there had long been a fuel oil tank referred to in the testimony as the "old tank" or the "small tank." This tank having proved inadequate in capacity, Dr. Siedlinski, with the consent of plaintiff, engaged the defendants to build a larger tank and to connect the two so that both might serve as reservoirs for the fuel oil used to heat the building. The old or small tank had a capacity of 800 gallons, while the new tank to be installed had a capacity of 1,800 gallons. The new tank had been delivered to the basement prior to Saturday, April 13, 1946. A witness for defendants testified that all the welding had been completed. At the request of defendants, Dr. Siedlinski turned off the heat on Saturday morning. Defendants' workmen were to come there that morning to finish the job of connecting the tanks and to put the system in operation. They did not come and as a consequence the tenants of the building did not have any heat or hot water on Saturday or Sunday. On Monday, April 15, 1946, shortly before 9:00 a. m. defendants' three servants, Abley, Budwitz and Morse, were admitted by Dr. Siedlinski to the basement, as he was the only one who had a key to the boiler room. It was locked at the time he admitted them. The men had two hoods, tools, wrenches and two welding attachments "that fire comes out of." Dr. Siedlinski did not remain there more than five minutes. He excused himself in order to attend the funeral of his aunt. He

came back at 11:15 a. m. and found the premises ''in an awful mess.'' It developed that the three men had been killed in an explosion in the basement.

The old fuel tank had exploded. At the time of the explosion no one was present except the three workmen. It was found that the new tank which had been previously completed was not moved or damaged. The old tank was to be moved out and the new one moved into its place and connected. The two tanks were to be connected together so that the oil would flow from one to the other. In the operation the first step was to move the old tank. When defendants' foreman, Clarence Summit, went to the boiler room after the explosion he saw that the old tank had been moved about three feet to the position where he found it. Mr. Hudson, Sr. said there was evidence that the old tank had been moved on rollers, approximately three feet. The old tank was to be used along with the new tank for additional oil. The proper procedure for the workmen would be to disconnect the tank, put it on a roller and move it. The old tank had a roller under it. The men had been moving it. The fill pipe and the vent pipe running from outside the building to the tank had been disconnected. Mr. Hudson, Sr. said that ''the fill pipe and the vent pipe would have had nothing to do with the explosion.'' Arthur J. Meany, testifying for plaintiff, stated that the workmen had tried to cut a hole in the smaller tank. Defendants' employees had been in the basement working from 9:00 a. m. to the time of the explosion, around 11:00 a. m. According to defendants' foreman Summit, the procedure for connecting one storage tank to another would be to weld a fitting in it and then connect it up with the other tank. He said the first procedure would be to clean out the tank and then weld on the fitting, then ''nipple it and you would have a nipple on the other fitting, and you would attach the two with a union.''

There was no evidence that the employees of defendants did anything towards cleaning out the old tank. According to Mr. Summit there are three or four ways of doing that. One of the best ways would be to clean it with carbon dioxide, ''or steam it or fill it with water during cutting.'' Mr. Summit said ''none of these things were done in this particular tank.'' Mr. Hudson, Sr. testified that if they were going to cut a hole in the tank they would have filled it with water. There is no doubt that the explosion burst the old tank and came from within that tank, and that the explosion was caused by the explosive fumes therein contained. All witnesses agree that the old tank contained a residue of sludge in its bottom. Plaintiff's evidence is that the fuel oil used in the tank is what is called ''No. 5 oil.'' A. J. Meany, a business representative for the Pipe Fitters Association, Local Union 597, called by plaintiff, testified that he was connected with that organization for 35 years; that his duties were the investigation of all accidents and explosions which might take place in Chicago; that he was chairman of the Safety Council Committee; that he had written books concerning boilers and explosions and a book on safety; that over a period of the last five years he had investigated about 100 explosions; that he arrived at the scene at about 8 o'clock the morning after the explosion; that he saw the tank that had exploded; that at the bottom of the tank there was just an oil sludge; that when the oil burner stops there are 4 to 6 inches of sludge in the bottom of the tank; that the only evidence he saw on the sides of the tank ''was where they tried to cut a hole in the tank''; that the hole there was very small, ''maybe the size of your finger''; that he had experience in torches and fuels and other things that cause fires; that he had several hundred welders in his employ at different times; that the only safe method to cut a hole in an

old tank that had No. 5 or 6 fuel oil in it, the safe method in doing a job of that kind, is to fill the tank with water; that there are other methods "but I don't try them"; that he does not recommend them; and that he would say over 6,000 and under 6,500 degrees of heat (Fahrenheit) is generated by a torch in cutting metal. W. F. Konie, called by plaintiff, testified that his business for 32 years was heating and oil burners; that he had charge of servicing the burner in question; that he saw it a month prior to the occurrence; that "they were using No. 5 industrial oil"; that after a tank has been used with No. 5 oil the sides and the top are always scummed up; that he was there after the fire and found water, sludge and oil, "everything was just sludge and mud and the debris was about two feet anyway, up to my knees"; that the proper method to connect an old tank to a new tank would be to run a hose in there and flush the oil out, run it in the sewer; that steam is used to flush down the sides, to get your slush washed down, you have to do that; and that with any of these three methods it is then safe to cut into the tank.

Ward V. Evans, called by the defendant, testified that until recently he was head of the department of chemistry at Northwestern University. During the first World War he was sent to Europe as a specialist in explosives and explosions. Explosive gases are his particular field, his more general field being physical chemistry. Now retired under Northwestern's policy of retiring men in their early 60's, he is professor of chemistry at Loyola University. He testified that No. 5 fuel oil will not explode, nor will its fumes explode; that if it were an explosive it could not be safely used for fuel oil in tanks or burners such as those involved in the instant case; that if someone essayed to burn a hole in a metal tank behind and above which there was oil in the tank, the oil would have gushed through the hole and would have caught fire, driving the welder away but could not have ex-

ploded; and that the oil would not have exploded anyway. On cross-examination, replying to the question: "Do you know what would be the safe method to cut into a tank that had 5 or 6 inches of oil in the bottom of it, that had been used for 10 years with No. 5 fuel oil, and the tank held about 800 gallons?" he answered: "Well, before I heard of this case, I wouldn't have taken any precautions. I would have just cut into it." Answering the question: "After you heard of the case, what would you do?" he answered: "I might put some water in it."

Plaintiff, invoking the doctrine of *res ipsa loquitur,* points out that defendants' servants were in the basement engaged in their duties of disconnecting and moving the old fuel oil storage tank and connecting it up with a new 1800 gallon fuel oil storage tank, which defendants, by their servants, had built in the basement; that none of this work, if done with due care, would have resulted in an explosion; that plaintiff made a *prima facie* case by showing that he was free from negligence; that defendants' servants were in the sole and exclusive possession and control of the basement and the instrumentality used in connection with the task in hand; that the burden of going ahead with the evidence then shifted to the defendants; that they did not sustain this burden; and that the verdict is in accordance with the law and the evidence. In *Chicago Union Traction Co. v. Giese,* 229 Ill. 260, the court said (263):

"When a thing which has caused an injury is shown to be under the management of the party charged with negligence, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from the want of proper care. This rule of law results from the maxim *res ipsa loquitur.*"

In *Sweeney v. Erving*, 228 U. S. 233, the court said (240):

"In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. *Res ipsa loquitur,* where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff."

In *Edmonds v. Heil*, 333 Ill. App. 497, the court, in applying the doctrine of *res ipsa loquitur*, said (510):

"The presumption of defendants' negligence was of course rebuttable and it was incumbent upon them to furnish an explanation of the occurrence of the fire consistent with due care on their part, if they could. Whether the evidence introduced by them in explanation of the occurrence of the fire was sufficient to rebut the presumption of their negligence was a question of fact for the jury to determine. The credibility of the witnesses and the probability of their testimony were also matters for the jury to determine."

Defendants state that the testimony is clear that the new tank had been built; that there was no occasion for cutting the old tank; that defendants' servants did not, for aught that appears, have authority to cut the old tank; that there is no evidence that they did in fact cut it; that there is no competent evidence contradicting the testimony of Dr. Evans, an authority on explosive gases, that the fumes of No. 5 oil are not explosive; that there is no evidence that the air vent

was clogged; that a verdict may not be founded upon speculation, conjecture or surmise; that if speculation were permissible, defendants might speculate that defective fuel oil or a clogged vent caused the deaths and recover damages from the plaintiff by subrogation for their servants' compensation death benefits; that defendants can no more demonstrate than can the plaintiff how the explosion occurred; that they can suggest plausible speculations, such as that the weather was chilly, the heat had been turned off; that any one of the numerous tenants may have put crank case drainage, gasoline, or some other substance more highly volatile than No. 5 fuel oil in the tank; and that if there was a hole in the tank it may have been due to a latent defect. Defendants cite several cases which discuss *res ipsa loquitur* in connection with oil and gas explosions. We have read all of these cases. In *Allegretti v. Murphy-Miles Oil Co.*, 363 Ill. 137, a clogged vent pipe was the cause of the explosion. In the case at bar defendants' foreman, Mr. Summit, and Mr. Hudson, Sr. testified that the old tank had been moved three feet. Mr. Hudson, Sr. said that in order to move the tank it was necessary to disconnect the vent pipe; that the fill pipe was disconnected; that the pipes were not on there on April 15, 1946, because the tank was moved; and that the fill pipe and vent pipe would have nothing to do with the explosion. In our opinion there is no analogy between the factual situations in the *Allegretti* case and the case at bar. This also applies to the other explosion cases cited by defendants.

Our view is that the doctrine of *res ipsa loquitur* is properly applied to the facts in the case at bar. The servants of defendants were in exclusive control. They were there to disconnect and move the old tank, which they did. They were to connect up the new 1,800 gallon tank and then connect the old tank with the new one. They were in exclusive control and

engaged in this work with their own tools and equipment at the time of the explosion. The old tank had been used until the previous Saturday. The hole that plaintiff's witness Meany found in the old tank was not there before the defendants' servants moved that tank. In order to connect the old tank with the new one, which was part of their work, it was necessary, according to defendants' foreman Summit, to weld a fitting in it. Abley, defendants' servant in charge of the job, was a welder and boiler maker. They were cutting the hole to put the fitting in. They undertook this job without cleaning out the old tank. Beside flushing it, there were three methods of cleaning it, but Mr. Summit said none of the three things was done. Mr. Hudson, Sr. said that the fill pipe and the vent pipe would have nothing to do with the explosion. They had been disconnected. It is worthy of note that Professor Evans testified that before he heard of the case he would not have taken any precautions in cutting into a tank that contained 5 or 6 inches of No. 5 fuel oil, but that after he heard of the case he might put some water in it. Mr. Meany stated that the safe method in doing a job of that kind is to fill the tank with water. Mr. Hudson, Sr. said that if they were going to cut a hole in the tank they would have filled it with water. Mr. Konie, whose business was heating and oil burners, said that the first thing to do before connecting the old tank to the new tank was to clean out the tank. There is no doubt that the explosion was in the old tank and that in order for the explosion to occur in that tank there had to be gases therein which would ignite with the oxygen in the air and cause the explosion. There was testimony that the explosion could have been caused by hammering and that the smallest kind of a spark would do it. Meany stated that the contact of an acetylene torch with a tank that has explosive fumes in it would cause the tank to explode and that there are gas fumes from crude oil. We are satisfied that

the means occasioning the explosion were in the exclu-
sive control of defendants' servants. They had this
exclusive control for about two hours before the un-
fortunate occurrence. The circumstances and condi-
tions under which the explosion occurred afforded
prima facie evidence to raise a presumption of de-
fendants' negligence under the doctrine of *res ipsa
loquitur*. This presumption was rebuttable and it was
incumbent upon defendants to furnish an explanation
of the occurrence consistent with due care on their
part, if they could. Whether the evidence introduced
by them in explanation of the occurrence was sufficient
to rebut the presumption of their negligence was a
question of fact for the jury to determine. The credi-
bility of the witnesses and the probability of their
testimony were also matters for the jury to determine.
There is nothing in the record which would make it
plausible to believe that one of the tenants might have
put crank case drainage, gasoline or some other sub-
stance more highly volatile than No. 5 fuel oil in the
tank. Dr. Siedlinski was the only one who had a key
to the basement. He let defendants' three employees
in on Monday morning, but no one else. Defendants
point out that neither they nor their employees had any
knowledge of what was in the tank. Defendants' serv-
ants did not adopt any of the usual safety measures,
such as filling the tank with water, before cutting into
the tank. Not knowing what was in the tank, they dis-
regarded the precautions ordinarily taken. The testi-
mony for defendants was that it was not necessary to
cut into the tank. There was testimony from which
the jury could find that their servants did cut into the
tank, and whether they did so, became a question of
fact for the jury.

Although defendants had control of the
tank, they had nothing to do with the filling of it. They
state that even though the vent had been disconnected,
it is possible that it was clogged. The purpose of a

vent is to permit the escape of explosive fumes. Mr. Hudson, Sr. said the fill pipe and vent pipe would have nothing to do with the explosion. We do not believe that the facts justify an inference that the vent, even though disconnected, was clogged. The act of disconnecting the vent pipe was performed by defendants' servants. Defendants state that their servants would have no occasion and no authority to make a hole in the tank. In their relations with plaintiff, defendants were responsible for the conduct of their servants in the performance of the work covered by the contract. It is reasonable to infer that the defendants' servants were performing their duties while they were in the basement. The jury had a right to decide from the evidence that they did make a hole in the tank, and that in doing so they were acting within their authority. Plaintiff had no control over defendants' servants, or the manner in which they would perform their duties.

Defendants assert that neither they or their employees had any knowledge of what was in the tank. Defendants were engaged in the business of erecting and installing tanks and it was their duty to take the precautions which the testimony shows should have been taken in doing that work, and particularly in connecting a new tank with an old tank which would be likely to contain oil and gases. The fact that defendants' servants undertook to install and connect the tanks without taking the precautions which the testimony shows should have been taken under the circumstances, and without knowing what was in the old tank, could be considered in determining the issue of defendants' negligence as the proximate cause of the explosion.

Defendants assert that the case at bar presents a question never decided so far as they know, raised by the fact that their three servants were killed in the explosion. They say that even if the doctrine of *res ipsa loquitur* were otherwise applicable, it is

grounded upon the assumption that those in control of a situation in which the mishap occurs are best able to explain how it occurred; that in this case their three servants were killed; and that therefore the rule grounded upon the premise that those who are best able to explain must do so, has no application. It is unfortunate that the three servants of the defendants were killed in the explosion and that they were the only persons who would, if alive, be the eyewitnesses to testify as to what caused the explosion. Any litigant may labor under the difficulty of producing witnesses to support his theory. In our opinion the fact that the only eyewitnesses to the occurrence were killed at the time does not affect the application of the rule. When all the evidence was in, the question for the jury was whether the preponderance was with the plaintiff. The case was properly submitted for determination by the jury. The evidence considered in connection with the doctrine of *res ipsa loquitur* supports the verdict.

Finally, defendants maintain that the verdict was in substance one for them because of the finding in favor of Mr. Hudson, Sr. on the counterclaim, and that therefore the court, without a motion for new trial, judgment notwithstanding the verdict, or other post verdict motion, should have entered a judgment for defendants. Relying on *Kelly v. Powers,* 303 Ill. App. 198; *Hayes v. Chicago Tel. Co.,* 218 Ill. 414; and *Billstrom v. Triple Tread Tire Co.,* 220 Ill. App. 550, defendants point out that Mr. Hudson, Sr. filed a counterclaim for work done in connection with building and installing the new boiler and work done in connecting the two boilers, and that he proved the value of the work that was being done by his servants on the day of the explosion. They state that he was not entitled to recover if his servants' workmanship was so unskillful as to wreck the building. Nevertheless, the jury returned a verdict for Mr. Hudson, Sr. on his counterclaim and judgment was entered on that verdict. De-

fendants state that nothing is better settled law than the rule that a verdict consistent with exoneration of a defendant vitiates a companion verdict finding guilt and assessing damages. The counterclaim or answer thereto is not in the record, nor do we find any instructions covering the issues on the counterclaim. We find that the verdict and judgment for Mr. Hudson, Sr. and against Dr. Siedlinski is not inconsistent with the verdict and judgment for plaintiff and does not vitiate that verdict and judgment. Dr. Siedlinski was a beneficiary under the trust and also managed the building. He dealt with Mr. Hudson, Sr., and the latter apparently looked upon him as the owner and the one with whom he contracted. Mr. Hudson, Sr. cleaned and washed plaintiff's boiler in March, for which he charged $70. There was no fault found with that job. Prior to April 15, 1946, defendants built the new 1,800 gallon storage tank in the basement. It was not damaged in the explosion. The charge for that was $225. After the explosion the defendants built an additional 1,700 gallon storage tank in the basement and the charge for that was $250. After the explosion "defendants lowered the water legs on the sides, back and front and one center leg under the boiler to improve the efficiency of the boiler and added more heating surface." The charge for that was $400. Plaintiff found no fault with that work. None of it was involved in the explosion. We find that there is nothing inconsistent in connection with the recovery by Mr. Hudson, Sr. of $945 on his counterclaim.

For the reasons stated, the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

KILEY and LEWE, JJ., concur.